**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**December 5, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA, *ex rel*. EDYTH L. SIKKENGA, and EDYTH L. SIKKENGA, on her own behalf,

     Plaintiffs-Appellants,

v.

REGENCE BLUECROSS BLUESHIELD OF UTAH, formerly known as Blue Cross and Blue Shield of Utah; ASSOCIATED REGIONAL AND UNIVERSITY PATHOLOGISTS, INC.; JOHN P. MITCHELL; JED H. PITCHER; and FRANK BROWN,

     Defendants-Appellees.

No. 05-4088

---

UNITED STATES OF AMERICA; TAXPAYERS AGAINST FRAUD EDUCATION FUND; ADMINASTAR FEDERAL, INC.; BLUECROSS BLUESHIELD ASSOCIATION; BLUE CROSS AND BLUE SHIELD OF ALABAMA; BLUE CROSS AND BLUE SHIELD OF KANSAS; BLUECROSS BLUESHIELD OF MONTANA; BLUECROSS BLUESHIELD OF NEBRASKA; BLUECROSS BLUESHIELD OF TENNESSEE; HEALTHNOW NEW YORK, INC.; MUTUAL OF OMAHA

INSURANCE COMPANY;
NORIDIAN MUTUAL INSURANCE
COMPANY; PREMERA
BLUECROSS; UNITED
GOVERNMENT SERVICES, L.L.C.;
WISCONSIN PHYSICIANS
SERVICE INSURANCE
CORPORATION; JON M.
HUNTSMAN, JR., Governor of Utah,

 Amici Curiae.

---

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:99-cv-00086-DAK)**

---

Arthur J. England, Jr., Greenberg Traurig, L.L.C., Miami, Florida; and Daniel L. Day, Murray, Utah (David K. Isom, Greenberg Traurig, L.L.C., Denver, Colorado; Matthew R. Howell, Fillmore Spencer, L.L.C., Provo Utah; Roger H. Hoole, Hoole & King, L.C., Salt Lake City, Utah, with them on the briefs) for Plaintiffs-Appellants.

Robert K. Huffman, Miller & Chevalier Chartered, Washington, D.C., (Randy L. Dryer and James T. Blanch, Parsons Behle & Latimer, Salt Lake City, Utah, with him on the brief), for Defendants-Appellees Regence Bluecross Blueshield of Utah, John P. Mitchell, Jed H. Pitcher, and Frank Brown.

James Jardine, Ray Quinney & Nebeker, P.C., Salt Lake City, Utah for Defendant-Appellee Associated Regional and University Pathologists, Inc.

Charles W. Scarborough, Appellate Division, Department of Justice, Washington, D.C., (Paul M. Warner, United States Attorney, District of Utah, Salt Lake City, Utah; Peter D. Keisler and Douglas N. Letter, Department of Justice, Civil Division, Washington, D.C., with him on the brief), for amicus curiae the United States of America on behalf of Plaintiffs-Appellants.

James Moorman, and Joseph E. B. White, Taxpayers Against Fraud Education Fund, Washington, D.C., filed an amicus curiae brief for Taxpayers Against Fraud

Education Fund on behalf of Plaintiffs-Appellants.

Michael S. Lee, General Counsel to the Governor, Salt Lake City, Utah, for amicus curiae Jon M. Huntsman, Jr., Governor of Utah on behalf of Defendant-Appellee Associated Regional and University Pathologists, Inc.

Gary L. Ayers, Foulston Siefkin, L.L.P., Wichita, Kansas, filed an amicus curiae brief for Adminastar Federal, Inc., Bluecross Blueshield Association, Blue Cross and Blue Shield of Alabama, Blue Cross and Blue Shield of Kansas, Bluecross Blueshield of Montana, Bluecross Blueshield of Nebraska, Bluecross Blueshield of Tennessee, Healthnow New York Inc., Mutual of Omaha Insurance Company, Noridian Mutual Insurance Company, Premera Bluecross, United Government Services, L.L.C., and Wisconsin Physicians Service Insurance Corporation on behalf of Defendant-Appellee Regence Bluecross Blueshield of Utah.

---

Before **LUCERO**, **PORFILIO**, and **HARTZ**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

Concerned that "two companies [were] bilking the United States out of millions of dollars," Edyth Sikkenga brought suit under the False Claims Act ("FCA"), 31 U.S.C. § 3729(a), alleging that her former employer, Regence BlueCross BlueShield of Utah ("Regence"), three Regence managers, and Associated Regional and University Pathologists ("ARUP") presented false Medicare claims to the Government. Sikkenga also presented the claim that Regence submitted a false budget payment request to the Health Care Financing

-3-

Authority ("HCFA"),[1] the agency that manages Medicare, and fraudulently avoided adverse contract action by HCFA by backdating and falsifying documents to manipulate its contract performance ratings. She also alleged that Regence retaliated against her by terminating her employment after she took actions to stop this "fraud." The district court dismissed her claim against ARUP, finding that it was not a "person" subject to liability under the FCA because it is an arm-of-the-state. The court dismissed all claims against Regence and the Regence employees, finding that Regence was immune from suit under 42 U.S.C. § 1395u(e), and that Sikkenga did not trigger the whisteblower provision of 31 U.S.C. § 3730(h) because she did not allege that she notified Regence of her intent to file an FCA claim. Sikkenga's state law claim was also dismissed on the basis that she failed to allege a clear and substantial public policy offended by Regence in Sikkenga's termination. Exercising jurisdiction under 28 U.S.C. § 1291, we **AFFIRM** the district court's dismissal of Sikkenga's false budget claim, its dismissal of her whistleblower claim, and its dismissal of her contract performance score manipulation claim. We **REVERSE** the lower court's dismissal of Sikkenga's claim against ARUP, her claim that Regence and its managers caused false claims to be presented, and her state law claim for wrongful termination, and **REMAND** for further proceedings consistent with this

---

[1] In 2001 this agency was renamed the Centers for Medicare and Medicaid Services.

decision.

**I**

Medicare is a federal insurance program which provides health benefits for elderly and disabled individuals. See 42 U.S.C. §§ 1395 et seq. The program is administered through private organizations contracted by the Department of Health and Human Services.[2] Medicare Part A provides for basic in-patient hospital services, nursing home and hospice care, and, in some instances, home health services. Part B, a voluntary supplemental program, provides reimbursement for outpatient hospital services, services of physicians and other health care professionals, and certain durable medical supplies and equipment. For five years, Sikkenga worked for Regence, the Medicare carrier for the State of Utah. Sikkenga's job included reviewing claims submitted by medical service providers, including laboratories such as ARUP, a laboratory entirely owned by, and located at the University of Utah Medical Center. After complaining internally that ARUP was presenting false claims for Medicare reimbursement, and that Regence had failed to take appropriate action to stop this "fraud,"

---

[2] Prior to 2003, Part A was administered by organizations known as "fiscal intermediaries" and Part B by organizations known as "carriers." See Blue Cross and Blue Shield of Maryland, Inc. v. United States Dep't of Health & Human Servs., 718 F. Supp. 80 (D.D.C. 1989). Carriers and intermediaries are now collectively called "medicare administrative contractors." 42 U.S.C. §§ 1395h(a), 1395u(a), 1395kk-1.

Sikkenga filed suit as a qui tam relator[3] under the FCA, 31 U.S.C. § 3729(a), against Regence, three Regence managers,[4] and ARUP. In her individual capacity, Sikkenga also brought an FCA whistleblower retaliation suit and several state law actions against Regence and its managers.

Sikkenga brought four claims under the FCA, including a whistleblower claim, and several state law claims. In her first FCA cause of action ("Claim 1"), Sikkenga alleged that Regence and ARUP violated the FCA when Regence paid claims for laboratory testing submitted by ARUP that were improper under Medicare Part B. Specifically, Sikkenga alleged that ARUP used a diagnostic code to falsely document the medical necessity of thousands of claims where ARUP did not obtain that code from the referring physician and the code did not document the true medical necessity of the test performed. Sikkenga also claimed that ARUP falsely submitted to Regence, a Medicare Part B carrier, various claims related to renal failure under a code suggesting that the patient was involved in a kidney transplant, when such a procedure should have been paid

---

[3] Under the FCA, an action can be commenced either by the United States itself, or as a qui tam action, by a private person, or "relator," acting "for the person and for the United States Government" against the alleged false claimant "in the name of the Government." Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 768 (2000). Sikkenga filed her Complaint against the Regence defendants and ARUP under seal pursuant to the qui tam provisions of the FCA. The United States declined to intervene and the complaint was unsealed and served on the defendants.

[4] The three Regence managers are John Mitchell ("Mitchell"), Jed H. Pitcher ("Pitcher"), and Frank Brown ("Brown").

through Medicare Part A, not Part B. After amending her complaint, Sikkenga also asserted that Regence "caused" ARUP to present these false claims.[5] She further argued that Regence's query of a Medicare database amounted to an independent presentation of a false claim to the government, or the use of a false record to get a false claim paid by the government under the FCA.

In her second FCA cause of action ("Claim 2"), Sikkenga alleged that Regence directly submitted a false budget request in 1992, in connection with an Early Claims Review process. Her third cause of action ("Claim 3") alleged that Regence fraudulently avoided Contractor Performance Evaluation Program ("CPEP") score reductions by backdating a letter involving a Comprehensive Medical Review and paying ARUP's claims as "adjustments" rather than "reviews." In essence, Sikkenga claimed that by manipulating its CPEP scores, Regence was able to obtain unmerited renewals of its contract as the Medicare Part B carrier for Utah, and that all claims for administrative costs under the contract thereafter were fraudulent. Finally, Sikkenga also asserted an FCA Whistleblower retaliation claim ("Claim 4"). Sikkenga abandons most of her

---

[5] The district court allowed Sikkenga to amend her complaint to cure failings in the allegations under Federal Rule of Civil Procedure 12(b)(6) and a lack of particularity for her "causing to be presented" FCA claims under Federal Rule of Civil Procedure 9(b). Sikkenga's initial complaint also included a conspiracy allegation. That claim was dismissed by the district court under Rule 12(b)(6), was not reasserted by Sikkenga in her amended complaint, and is not a subject of this appeal.

state law claims, appealing only the district court's dismissal of her wrongful termination in violation of public policy claim.[6]

The district court dismissed Claim 1 because it determined that both Regence and the Regence managers were immune from suit and that ARUP was not a "person" under the FCA; Claim 2 because it was barred by the FCA's statute of limitations; Claim 3 because Sikkenga failed to allege fraud with the particularity required under Federal Rule of Civil Procedure 9(b); and Claim 4 because Sikkenga had not alleged that she had notified Regence of her intent to file an FCA claim. Because there were no grounds to suggest that Sikkenga's termination was in violation of a clear and substantial public policy absent an underlying FCA claim, the court dismissed her state law wrongful termination claim as well. We review Sikkenga's appeal of each of these dismissals.

**II**

Sikkenga contends that the district court made three errors in dismissing Claim 1, her FCA claim that ARUP submitted "false" claims to Regence and that Regence paid them. First, she argues that the district court erred in ruling that Medicare Part B's immunity provision, 42 U.S.C. § 1395u(e),[7] provided Regence

---

[6] Sikkenga's four state law causes of action were: wrongful termination in violation of public policy, breach of contract for failure to pay accrued vacation pay, intentional infliction of emotional distress, and breach of the implied covenant of good faith and fair dealing in the employment contract.

[7] The enactment of the Medicare Prescription Drug, Improvement and

(continued...)

with absolute immunity from any suit premised on its payment of ARUP's claims. Second, Sikkenga contends that the court erred when it ruled, under Rule 12(b)(6), that she had failed to adequately allege that Regence had "caused" ARUP to present false claims. Finally, Sikkenga appeals the district court's determination that ARUP was an arm-of-the-state and therefore not a "person" liable under the FCA.

A

Regence has been the major Medicare Part B carrier for Utah since 1987,

---

[7](...continued)
Modernization Act of 2003, Pub. L. 108-173, 117 Stat. 2066 (2003), alters the language of the immunity provision made applicable to "medicare administrative contractors":

> (3) LIABILITY OF MEDICARE ADMINISTRATIVE CONTRACTOR. –
>
> (A) IN GENERAL. – No medicare administrative contractor shall be liable to the United States for a payment by a certifying or disbursing officer, unless in connection with such payment, the medicare administrative contractor acted with reckless disregard of its obligations under the medicare administrative contract or with intent to defraud the United States.
>
> (B) RELATIONSHIP TO FALSE CLAIMS ACT. – Nothing in this subsection shall be construed to limit liability for conduct that would constitute a violation of sections 3729 through 3731 of title 31, United States Code.

42 U.S.C. § 1395kk-1(d)(3).

The 2003 amendments to the Medicare Act did not go into effect until October 2005, and do not apply retroactively to cases alleging fraud by a contractor prior to that date. Additionally, the Centers for Medicare and Medicaid Services, the new name for the reorganized HCFA, has until 2011 to phase in new contracts with medicare administrative contractors. Therefore, our interpretation of the immunity provision under § 1395u(e)(3) will apply to actions brought under existing or older contracts for the near future.

pursuant to a contract with the Department of Health and Human Services' Health Care Financing Administration ("HCFA"). Under its contract, Regence was responsible for processing and paying Medicare Part B claims submitted by medical care providers. As part of its claims evaluation process, Regence was contractually obligated to ensure that claims were paid only for medically necessary care – a requirement for reimbursement under the Medicare program.

From June 20, 1990, until she was terminated on April 4, 1995, Sikkenga worked for Regence in its Medicare Part B Review and Analysis Division. During her employment, Sikkenga became concerned that Regence was paying ARUP for laboratory testing claims that did not adequately document their medical necessity, and were potentially improper under Medicare Part B. Specifically, Sikkenga was concerned that ARUP was using a generic ICD-9 code 796.4 "other abnormal clinical finding," to document the medical necessity of thousands of claims when a more specific code was applicable.[8] Sikkenga thought that claims using this generic code, when ARUP had not obtained the code from the referring physician, did not document the true medical necessity of the test performed, and as such were not properly payable under Medicare Part B.

_____

[8] ICD-9-CM codes refers to the International Classification of Diseases, Ninth Revision, Clinical Modification codes, a coding system used to describe the diagnosis or medical condition for which medical services are rendered when Medicare claims are submitted to Medicare carriers. Such codes are not required from independent clinical laboratories for non-physician services, but can be used by them to document medical services. See 42 C.F.R. §§ 424.3, 424.32.

Sikkenga also suspected that ARUP falsely submitted various ICD-9 codes related to renal failure in connection with CPT code 86317, a code suggesting that the patient was involved in a kidney transplant, a procedure that should have been paid through Medicare Part A, rather than Part B.[9]  Because of her concern that these claims were fraudulent, Sikkenga implemented internal audits to more closely evaluate ARUP's claims using the suspect codes, referred the matter to Regence's internal fraud and abuse section, discussed the matter with her supervisors within Regence, and instructed ARUP to change its billing practices. Sikkenga claims that she was ultimately terminated from her position with Regence in April 1995 because of her managers' dissatisfaction with her actions regarding ARUP.

**B**

The FCA imposes liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1), or "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2).  In her first FCA claim, Sikkenga alleged that Regence

---

[9]  CPT codes refer to "Current Procedural Technology" codes, which describe medical services such as treatments, tests, and procedures, and are an accepted means of reporting such medical services to government and health insurance programs.

and the individual defendants had violated the FCA by paying false claims involving the 796.4 codes and renal failure tests. Relying on <u>United States ex rel. Body v. Blue Cross and Blue Shield of Alabama, Inc.</u>, 156 F.3d 1098 (11th Cir. 1998), the district court interpreted the Medicare immunity provision, 42 U.S.C. § 1395u(e), to provide absolute immunity to Medicare contractors' payments of claims. On that basis, the court found that Regence and the individual defendants were immune from suit as to any claims based on Regence's payment of the allegedly false claims, interpreting that provision to provide absolute immunity to a Medicare contractor's payment of a claim. The version of Medicare's statutory immunity provision in effect at the time of this case states:

> (1) No individual designated pursuant to a contract under this section as a certifying officer shall, in the absence of gross negligence or intent to defraud the United States, be liable with respect to any payments certified by him under this section.
> (2) No disbursing officer shall, in the absence of gross negligence or intent to defraud the United States, be liable with respect to any payment by him under this section if it was based upon a voucher signed by a certifying officer designated as provided in paragraph (1) of this subsection.
> (3) No such carrier shall be liable to the United States for any payments referred to in paragraph (1) or (2).

42 U.S.C. § 1395u(e) (1999).

In <u>Body</u>, the Eleventh Circuit held that Medicare's Part A immunity provision, 42 U.S.C. § 1395h(i)(3),[10] unambiguously provided absolute immunity

---

[10] The statutory language of the Medicare Part A immunity provision is essentially identical to the Part B immunity provision. Section 1395h(i) differs

(continued...)

-12-

to Medicare fiscal intermediaries, in contrast to the express limitation present in §§ 1395h(i)(1) and (2), which provided immunity for payments by certifying or disbursing officers only in the absence of gross negligence or intent to defraud. Body, 156 F.3d at 1112. Sikkenga contends that the district court misinterpreted § 1395u(e)(3), and that the immunity conferred on Medicare carriers by this provision does not extend to circumstances involving gross negligence or an intent to defraud the United States.

"We review the district court's interpretation of a federal statute de novo." United States v. Quarrell, 310 F.3d 664, 669 (10th Cir. 2002). In interpreting statutes our primary task is to "determine congressional intent, using traditional tools of statutory interpretation." McGraw v. Barnhart, 450 F.3d 493, 498 (10th Cir. 2006). "When interpreting the language of a statute, the starting point is always the language of the statute itself. If the language is clear and unambiguous, the plain meaning of the statute controls. A statute is ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different senses." Id. (quoting Quarrell, 310 F.3d at 669). "If an

_____

[10](...continued)
from § 1395u(e) only in substituting "an agreement" for "a contract" and "agency or organization" for "carrier." Under the doctrine of in pari materia we give these statutes the same interpretation and refer to them interchangeably hereinafter. See United States ex rel. Rahman v. Oncology Assocs., 201 F.3d 277, 287 n.2 (4th Cir. 1999) (discussing cases in which courts have treated Part A fiscal intermediaries and Part B carriers equivalently).

ambiguity is found, a court may seek guidance from Congress's intent, a task aided by reviewing the legislative history. A court can also resolve ambiguities by looking at the purpose behind the statute." Id. at 499.

To decide the extent of immunity conferred upon Medicare Part B carriers, we look to the text of § 1395u(e)(3), specifically, what is meant by its incorporation of the phrase "any payments referred to in paragraph (1) or (2)." Body looked solely to the text of § 1395h(i)(3) and held that the absence of the qualifying language present in the first two paragraphs was determinative. Although we agree with the Eleventh Circuit that §§ 1395h(i)(3) and 1395u(e)(3) are unambiguous, we disagree that they do not include the gross negligence and fraud exception. This is made clear by restating § 1395u(e) to avoid the egregious use of the split infinitive:

> (1) In the absence of gross negligence or intent to defraud the United States, no individual designated pursuant to a contract under this section as a certifying officer shall be liable with respect to any payments certified by him under this section.
> (2) In the absence of gross negligence or intent to defraud the United States, no disbursing officer shall be liable with respect to any payment by him under this section if it was based upon a voucher signed by a certifying officer designated as provided in paragraph (1) of this subsection.
> (3) No such carrier shall be liable to the United States for any payments referred to in paragraph (1) or (2).

Correctly read, the payments referred to and incorporated by § 1395u(e)(3) are payments made "in the absence of gross negligence or intent to defraud the United States."

-14-

To the extent that our disagreement with the Eleventh Circuit can be said to evince ambiguity in the statute, see Quarrell, 310 F.3d at 669 ("A statute is ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different senses.") (internal quotations omitted), we find support for our interpretation in the legislative history of this provision. See United States v. Roberts, 88 F.3d 872, 877 (10th Cir. 1996) ("Only if the statutory language is ambiguous should a court turn to legislative history as an aid in determining the statute's meaning."). In the House Conference Report accompanying the passage of § 1395u(e)(3), the committee stated that this provision provides carriers with "the same immunity from liability for incorrect payments as would be provided their certifying and disbursing officers."[11] H.R.

---

[11] The language in § 1395u(e)(3) was not included in the original draft of House Resolution 6675 (Social Security Amendments of 1965). H.R. Rep. No. 89-213, at 148, 160 (1965) (Section analysis of §§ 1816(g)(1), (2) and 1842(e)(1), (2)). Section 1842(e)(3) of H.R. 6675, applicable to carriers under Medicare Part B, ultimately became codified at 42 U.S.C. § 1395u(e)(3), the provision we are interpreting. Section 1816(g)(3) applied to fiscal intermediaries under Medicare Part A became codified at 42 U.S.C. § 1395h(i)(3). On May 17, 1965, Assistant Secretary of the Department of Health, Education, and Welfare ("HEW"), Wilbur Cohen, fulfilling a promise made to the Senate Finance Committee by the Secretary of HEW, forwarded recommended clarifying and technical changes to the resolution in a letter from HEW to the Chairman of the Committee. The title of the relevant proposed amendment was: "Provide that an employing agency of certifying or disbursing officer would be excused from liability when such officer is excused." The text of the change was: "(3) No carrier shall be liable to the United States for any payments referred to in paragraph (1) or (2)." A Bill to Provide a Hospital Insurance Program for the Aged Under the Social Security Act with a Supplementary Health Benefits Program and an Expanded Program of

(continued...)

Rep. No. 89-682, at 37 (1965) (Conf. Rep.), as reprinted in 1965 U.S.C.C.A.N. 2228, 2231. Thus, the legislative history unequivocally resolves any ambiguity that might exist because of the statute's poor grammatical structure. The immunity available to Regence as a Medicare carrier under § 1395u(e)(3) is co-extensive with that of its certifying and disbursing officers – in other words, the

---

[11](...continued)
Medical Assistance, to Increase Benefits Under the Old-age, Survivors, and Disability Insurance System, to Improve the Federal-State Public Assistance Programs, and for Other Purposes: Hearings on H.R. 6675 Before the S. Comm. on Fin., 89th Cong. 499 (1965) (Letter of the Hon. Wilbur Cohen). Explaining the recommended amendment, Assistant Secretary Cohen stated:

> The changes are needed in order to provide agencies and organizations authorized to make payments under part A and carriers authorized to make payments under part B with the same immunity from liability for incorrect payments as would be provided their certifying and disbursing officers.

Id.

On June 3, 1965, the Senate Finance Committee published these recommended amendments in a committee print. Staff of S. Comm. on Fin., 89th Cong., Text of and Justifications for Amendments to H.R. 6675 Recommended by the Department of Health, Education, and Welfare 28-29 (Comm. Print 1965). Cohen's proposed changes were included in the Senate Finance Committee report dated June 30, 1965. S. Rep. No. 89-404, at 165, 177 (1965), as reprinted in 1965 U.S.C.C.A.N. 1943, 2104, 2117. The language from HEW's letter was included in the Conference Report. H.R. Rep. No. 89-682, at 37 (1965) (Conf. Rep.), as reprinted in 1965 U.S.C.C.A.N. 2228, 2231. The amendment of both immunity provisions, in such a short span of time, with the language and explanation included in the committee reports from both the Senate Finance and Conference Committees, strongly indicates the intent of Congress was not to grant absolute immunity to carriers in § 1395u(e)(3), but instead, as stated by the Conference Report, to provide carriers with the same immunity as their certifying and disbursing officers.

immunity excludes cases involving fraud and gross negligence. [12]

---

[12] Further, in contrast to the district court's evaluation below, the legislative history accompanying Congress's 2003 amendment of the Medicare statute indicates that the textual change to the immunity provision, now present at 42 U.S.C. § 1395kk-1(d), was not intended to change the law, but merely to continue to provide the same limited immunity that Medicare carriers enjoyed prior to the amendment:

> Medicare contractor reform will not succeed if contractors are subject to unlimited civil liability for carrying out the payments . . . expected of them. The conference agreement would therefore continue the past policy of limiting the liability of certifying and disbursing officers, and the Medicare administrative contractors for whom those officers serve, with respect to certain payments.
>
>    In addition, the language contained in [§§ 1395k-1(d) of] the conference agreement clarifies that Medicare administrative contractors are not liable for inadvertent billing errors, but, as in the past, are liable for all damages resulting from reckless disregard or intent to defraud the United States. Importantly, the reckless disregard standard is the same as the standard under the False Claims Act. This standard balances the practical need to shelter Medicare administrative contractors from frivolous civil litigation by disgruntled providers or beneficiaries with the Medicare program's interest in protecting itself from contractor fraud. . . .[The FCA] applies to Medicare fiscal intermediaries and carriers under current law.

149 Cong. Rec. S15,606, S15,644 (2003) (emphasis added) (statement of Sen. Grassley during debate on the Medicare Drug, Improvement and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (2003)). Our reading of the statute avoids the potential pitfall created by Body – that its broad all-encompassing immunity would render Medicare carriers immune under the FCA for any actions remotely premised on payment – and meets our obligation to construe statutes harmoniously. See Chemical Weapons Working Group v. Dep't of the Army, 111 F.3d 1485, 1490 (10th Cir. 1997) (stating that we are required to construe apparently conflicting statutes harmoniously when possible). It is important to note that under the normal rule of liability for disbursing and certifying officers and their supervisors, such officers and supervisors are liable even for negligent payments. 31 U.S.C. §§ 3527(a), 3528. The Medicare immunity provision, rather than indicating a complete abandonment of the normal

(continued...)

-17-

## C

Our interpretation of the statute, however, does not require that we reverse the district court's dismissal of Sikkenga's fraudulent payment claims in their entirety. Because the FCA does not provide a remedy for claims for <u>payment</u> of a false or fraudulent claim, dismissal of these claims under Rule 12(b)(6) was appropriate.[13] However, Sikkenga also alleged that Regence <u>caused</u> fraudulent claims to be submitted to the federal government. Section 1395u(e)(3), which contains a fraud exception, does not provide immunity for carriers who cause fraudulent claims to be presented.

The district court's order did not recognize immunity for Regence as to Sikkenga's "causing to be presented" claim under the FCA. Instead, acknowledging that "Regence's immunity may not extend to the FCA's prohibition against 'causing' false claims to be presented," the district court dismissed Sikkenga's first FCA cause of action against Regence without prejudice and provided Sikkenga the opportunity to amend her complaint to specifically plead facts that would support her claim that Regence caused ARUP to submit

---

[12](...continued)
presumption that individuals disbursing government funds are responsible for negligent payments, indicates instead Congress's intent to provide some limitation to this normal default rule, not a "blank check" for Medicare carriers to commit fraud free from the FCA.

[13] Similarly, no FCA cause of action exists as to the individual Regence defendants merely for "paying" the claims.

-18-

false claims.[14] The district court subsequently rejected Sikkenga's position that her amended allegations were sufficient to allege that Regence "caused" ARUP to present false claims. In doing so, the court interpreted the FCA's "causing to be presented" language as requiring "some sort of affirmative action on the part of the defendant before imposing liability." Interpreting Sikkenga's complaint to allege only passive acceptance of ARUP's claims, the district court found that Sikkenga's allegations had failed to demonstrate an affirmative action, and dismissed the claim against Regence and the Regence defendants under Rule 12(b)(6). On the same grounds, the district court dismissed Sikkenga's argument, presented for the first time in her amended complaint, that Regence's actions in querying a Medicare database called the "Common Working File" ("CWF" or "Host"),[15] was either the presentation of a false claim to the government, or,

---

[14] The district court instructed Sikkenga to "allege specific facts demonstrating that the Regence Defendants caused ARUP to present false claims rather than merely allowing or accepting such claims." Because the district court dismissed the first cause of action without prejudice for failure to plead fraud with particularity under Federal Rule of Civil Procedure 9(b), it provided Sikkenga sixty days to amend her complaint and plead her first cause of action with the particularity required by Rule 9(b), and instructed her to "identify specific claims that did not properly document medical necessity."

[15] The Common Working File, or Host, is a computerized database for maintaining Medicare beneficiary information for persons within an assigned geographical area. The CWF/Host is maintained by a separate contractor under contract with the Department of Health and Human Services, and contains Medicare beneficiary entitlement and utilization data. See Blue Cross & Blue Shield of Maryland, Inc. v. United States Dep't of Health & Human Servs., 718 F. Supp. 80, 81 n.4 (D.D.C. 1989).

under 31 U.S.C. § 3729(a)(2), the knowing making, or using of a false record to get a false claim paid or approved.[16] We now turn to the dismissal of these claims under Rule 12(b)(6).

**1**

We review dismissals under Rule 12(b)(6) de novo, and will uphold such a dismissal "only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle him to relief, accepting the well-pleaded allegations of the complaint as true and construing them in the light most favorable to the plaintiff." Dobbs v. Head Start, Inc., 336 F.3d 1194, 1201 (10th Cir. 2003) (quotations omitted). Our role is to assess whether the plaintiff's complaint alone is legally sufficient to state a claim upon which relief may be granted. Id.

In her amended complaint, Sikkenga focused on the "resolution" reached between the Regence individual defendants, Regence, and ARUP that "allowed" ARUP to continue to submit claims with the 796.4 code, arguing that:

---

[16] Sikkenga also included two lists of ARUP claims that she alleges were false because they used the ICD-9 code of 796.4 to document medical necessity. Regence continued to assert before the district court that these lists failed to meet the requirements of Fed. R. Civ. P. 9(b) because they failed to specify which claims were false under Sikkenga's theory. Regence argued that merely stating that some of the listed claims were false was not sufficient to meet Rule 9(b)'s particularity requirements. Because the district court held that Sikkenga failed to allege a violation of the FCA under Rule 12(b)(6), it did not decide Regence's pending Rule 9(b) motion.

by way of this 'resolution' . . . [defendants] reached an agreement among themselves to systematically circumvent the requirements of the Contract and the Social Security Act and related regulations for the purpose of getting ARUP's false claims paid by the government with Medicare Part B funds even though these Defendants were fully aware that such claims were not payable.

She also alleged that "[b]y assuring ARUP that such claims would continue to be accepted, Regence encouraged, facilitated, and caused ARUP's presentation of false claims for payment." (emphasis added).

**2**

In order to determine whether Sikkenga's allegations survive a Rule 12(b)(6) challenge, we must first decide what is required for an entity to have "caused" a claim to be presented under the FCA. One case, United States ex rel. Long v. SCS Bus. & Technical Inst., 999 F. Supp. 78, 91 (D.D.C. 1998), rev'd on other grounds, 173 F.3d 890 (D.C. Cir. 1999), supports Sikkenga's view that the failure to prevent a third party from filing false claims after having knowledge that the claims were false is sufficient to state a claim under the FCA.

> Where a defendant has an ongoing business relationship with a repeated false claimant, and the defendant knows of the false claims, yet does not cease doing business with the claimant or disclose the false claims to the United States, the defendant's ostrich-like behavior itself becomes "a course of conduct that allowed fraudulent claims to be presented to the government."

United States v. President & Fellows of Harvard College, 323 F. Supp. 2d 151, 187 (D. Mass. 2004) (quoting Long, 999 F. Supp. at 91). Sikkenga asserts that in United States ex rel. Marcus v. Hess, the Supreme Court interpreted the "causing

-21-

to be presented language" of an earlier version of the FCA to "reach any person who knowingly <u>assisted</u> in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." 317 U.S. 537, 544-45 (1943) (emphasis added). However, <u>Hess</u> involved consideration of the text of the FCA as a whole, not solely the "causing to be presented" provision. <u>Id.</u> at 544-45. We do not consider <u>Hess</u>'s "assisted" language to be dispositive in analyzing whether she has adequately pled a "causing to be presented" claim.

Relying on <u>United States ex rel. Shaver v. Lucas W. Corp.</u>, 237 F.3d 932, 933 (8th Cir. 2001), and <u>United States v. Mackby</u>, 261 F.3d 821, 827-28 (9th Cir. 2001), the defendants argue that the FCA requires an affirmative instruction to present a false claim before imposing liability. The district court rejected both parties' contentions, instead interpreting <u>Shaver</u> and <u>United States ex rel. Glass v. Medtronic, Inc.</u>, 957 F.2d 605, 606 (8th Cir. 1992), to require "some sort of affirmative action on the part of a defendant before imposing liability [under the FCA]." Motivating the district court was its concern that too broad an interpretation of the "causes to be presented" language in the FCA "would impose liability on parties merely for failing to prevent the fraudulent acts of others." We share this concern.

Generally, mere knowledge of the submission of claims and knowledge of

the falsity of those claims is insufficient to establish liability under the FCA. See

United States v. Murphy, 937 F.2d 1032, 1039 (6th Cir. 1991). Under

§ 3729(a)(1)'s requirement that a person "cause" a false claim to be presented, the

appropriate focus of the inquiry is on "the specific conduct of the person from

whom the Government seeks to collect." United States v. Bornstein, 423 U.S.

303, 313 (1976). Thus, the appropriate inquiry under § 3729(a)(1) is whether that

specific conduct causes the presentment of a false claim.

The Third Circuit has borrowed traditional principles of tort law to analyze

causation for damages under the FCA. See United States v. Hibbs, 568 F.2d 347,

349 (3d Cir. 1977) (holding that, in assessing damages under the FCA, "a causal

connection must be shown between loss and fraudulent conduct" and that "a broad

'but for' test is not in compliance with the [FCA]"). Such an approach is useful

in analyzing causation under § 3729 as well, and provides a familiar test – that of

proximate causation – to determine whether there is a sufficient nexus between

the conduct of the party and the ultimate presentation of the false claim to support

liability under the FCA. Such a test separates the wheat from the chaff, allowing

FCA claims to proceed against parties who can fairly be said to have caused a

claim to be presented to the government, while winnowing out those claims with

only attenuated links between the defendants' specific actions and the

presentation of the false claim. Attempting to strike this same balance, the

district court required "some sort of an affirmative action on the part of the

-23-

defendants." We agree that a standard requiring more than mere passive

acquiescence is most consistent with the purposes of the FCA. Furthermore, such

a standard strikes the appropriate balance between shielding from liability parties

who merely fail to prevent the fraudulent acts of others, and ensuring that liability

attaches for "affirmative acts" that do cause or assist the presentation of a

fraudulent claim.[17]

Applying this standard to Sikkenga's allegations, we disagree with the

district court's assessment that Sikkenga failed to sufficiently allege a "causing to

be presented" claim under the FCA. Our role in reviewing a Rule 12(b)(6)

dismissal is "not to weigh potential evidence that the parties might present at

trial, but to assess whether the plaintiff's complaint alone is legally sufficient to

---

[17] Although the partial concurrence and partial dissent would not rule on the scope of causation under the FCA, we consider establishing this standard necessary to resolving the case before us. A bald assertion that a defendant has caused a false claim to be presented would plainly fail to state a claim for relief. See Hall v. Bellmon, 935 F.2d 1106, 1109-10 (10th Cir. 1991) ("[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based."). We therefore must consider whether Sikkenga's factual allegations are sufficient to support a "causes to be presented" FCA claim.

The proximate causation standard strikes the proper analytical balance and comports with the rule requiring strict construction of punitive civil statutes. See Comm'r v. Acker, 361 U.S. 87, 91 (1959). As noted above, there is no support for the defendants' position that a causing to be presented claim requires a direct order to present a false claim. The only remaining plausible constructions of "causes to be presented" are but for causation and proximate causation. By adopting proximate causation we narrow, rather than enlarge, the field of actions for which FCA liability may be imposed.

state a claim upon which relief may be granted." Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999). Although a close case, Sikkenga's allegations state that Regence engaged in certain actions, specifically, "agreeing to circumvent" contractual and statutory requirements, and "assuring" ARUP that Regence would continue to accept the claims coded with the disputed 796.4 code. Sikkenga alleges that these actions assisted ARUP in continuing to submit the allegedly false claims. She supports her description of the alleged scheme with specific actions taken by Regence that she claims were in support of this "agreement to circumvent." Because we must construe these allegations in the light most favorable to Sikkenga, we cannot conclude that Sikkenga could prove no set of facts in support of her claim that would entitle her to relief against Regence for "causing" ARUP to present the allegedly false claims. Accordingly, we reverse the district court's dismissal of Sikkenga's claim that Regence "caused" ARUP to present false claims under Rule 12(b)(6),[18] and remand for further proceedings consistent with this opinion.[19]

_____

[18] For the same reason, the dismissal of Sikkenga's "causing to be presented" claims against the individual Regence defendants is also reversed.

[19] We caution, however, that we express no opinion as to whether Sikkenga's complaint meets the requirements of Rule 9(b) to plead fraud with particularity. See United States ex rel. Clausen v. Lab. Corp. of Am., 290 F.3d 1301, 1308-09 (11th Cir. 2002) (holding that Rule 9(b) applies to actions under the FCA); Bly-Magee v. California, 236 F.3d 1014, 1018 (9th Cir. 2001) (same); United States ex rel. Russell v. Epic Healthcare Mgmt. Group, 193 F.3d 304, 308 (5th Cir.1999) (same); Harrison v. Westinghouse Savannah River Co., 176 F.3d

(continued...)

**3**

In her amended complaint, Sikkenga introduced a new theory of FCA liability, arguing that Regence's actions in querying the CWF/Host amounted to either the presentation of a false claim to the government, or, under 31 U.S.C. § 3729(a)(2), the knowing, making, or using of a false record to get a false claim paid or approved. The district court rejected this theory, finding that

> Regence's query to the Host and the CWF is not a claim for payment but, rather, a secondary data review within the Medicare claim processing and payment process that is designed to look at an additional body of information to ensure that payments only go to beneficiaries with proper utilization and entitlement status.

We agree with the district court that Regence's query to the Host/CWF was not a separate presentation of a false claim or the making or using of a false record to get a false claim paid. To the contrary, the CWF was designed to improve the accuracy and timeliness of Medicare claims processing by reducing payment errors and providing carriers with updated entitlement and eligibility data on beneficiaries. See Blue Cross & Blue Shield of Maryland, Inc. v. United

---

[19](...continued)
776, 783-84 (4th Cir.1999) (same); United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc., 149 F.3d 227, 234 (3d Cir. 1998) (same); Gold v. Morrison-Knudsen Co., 68 F.3d 1475, 1476-77 (2d Cir.1995) (same, collecting cases). Although we admit to some concern that Sikkenga's allegations are an inadequate attempt to allege a conspiracy under § 3729 (a)(3) under the guise of alleging a "causing to be presented" claim, we are confident that a proper Rule 9(b) analysis by the district court on remand can determine if her allegations meet Rule 9(b)'s particularity requirements.

States Dep't of Health & Human Servs., 718 F. Supp. 80, 81 n.4 (D.D.C. 1989). The Medicare Carrier Manual describes the CWF as a part of the processing of a claim for payment concerned with verifying a portion of the requirement for payment and facilitating the integration of Medicare databases for each eligible beneficiary. Medicare Carriers Manual, Part 3, §§ 6000 et. seq. This CWF/Host query is clearly a secondary data review within the payment process. Being such, the district court's dismissal of Sikkenga's claims premised upon Regence's query to the Host/CWF under Rule 12(b)(6) is **AFFIRMED**.[20]

**D**

We now turn to the district court's decision that ARUP is an arm-of-the-state and thus not subject to liability under the FCA. After according the parties one year of limited discovery on the issue of whether ARUP is a state entity, the district court applied the test we articulated in Sturdevant v. Paulsen, 218 F.3d 1160 (10th Cir. 2001), and concluded that ARUP was "sufficiently tied to the University of Utah to be considered an arm of the state." The court then dismissed Sikkenga's sole FCA claim against ARUP.[21] In her appeal of this decision, Sikkenga advances two arguments. First, she urges that because ARUP is a corporation, it must be a person and therefore is liable under the FCA.

---

[20] To the extent this allegation reaches the individual Regence defendants, its dismissal similarly is affirmed.

[21] Because of this determination, the district court did not rule upon ARUP's claim that it was entitled to Eleventh Amendment immunity.

Second, Sikkenga argues that the district court improperly found that ARUP is an arm-of-the-state.

Because the FCA imposes liability for "[a]ny person who – (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a) (emphasis added), subject matter jurisdiction for an FCA claim under 28 U.S.C. § 1331 depends on the claim being made against a person as that term is interpreted under the FCA.  See Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 778-780 (2000).  When subject matter jurisdiction is dependent on the same statute which provides the substantive claim in the case, then the jurisdictional question is intertwined with the merits of a case, and a Rule 12(b)(1) motion should be resolved under either Rule 12(b)(6) or Rule 56.  United States ex rel. King v. Hillcrest Health Ctr., Inc., 264 F.3d 1271, 1278 (10th Cir. 2001).  When a court relies on affidavits and other evidentiary material submitted by the parties to resolve disputed jurisdictional facts, a defendant's motion to dismiss should be treated as one for summary judgment under Rule 56(c).  United States ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1518 (10th Cir. 1996).  Although the district court did not treat ARUP's motion as one for summary judgment, even though it relied on materials outside the complaint, we will exercise our plenary power and consider the defendant's motion as a motion for summary judgment.  See id.  We review

the grant of summary judgment de novo, applying the same legal standard used by the district court under Rule 56(c). Id. The determination of subject matter jurisdiction is reviewed de novo.[22] Id.

Even though we recognize the ordinary presumption of "personhood" that arises from ARUP's incorporation, see 1 U.S.C. § 1; Cook County v. United States ex rel. Chandler, 538 U.S. 119,125 (2003), this recognition is tempered by the Supreme Court's express instruction that under the FCA we must apply the longstanding interpretive presumption that the term person does not include a sovereign. See Stevens, 529 U.S. at 784 n.14; see also United States ex rel. Adrian v. Regents of the Univ. of California, 363 F.3d 398, 401 (5th Cir. 2004) (holding that the Regents are an arm-of-the-state despite corporate organization through which it managed university laboratory); Donald v. Univ. of California Bd. of Regents, 329 F.3d 1040, 1044 (9th Cir. 2003) (holding Regents are an arm-of-the-state despite corporate organization through which it managed university hospital). Thus, in Stevens, after recognizing the "virtual coincidence of scope" between the statutory inquiry under the FCA and the Eleventh Amendment inquiry, the Court held that the term person in the FCA does not include States. Stevens, 599 U.S. at 780. Subsequently, in Chandler, the Court held that

_____

[22] We agree with the district court's observation that "the facts regarding ARUP's relationship with the University of Utah do not appear to be in dispute. Rather, it is the legal import to assign certain facts that is in dispute."

-29-

municipal corporations were included as potentially liable "persons" under the FCA. 538 U.S. at 133. This distinction mimics that made by the Court in the Eleventh Amendment context, where it explained: "the bar of the Eleventh Amendment to suits in federal courts extends to States and state officials in appropriate circumstances, but does not extend to counties and similar municipal corporations." Sturdevant, 218 F.3d at 1164 (quoting Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1974)). In order to draw this statutory distinction under the FCA, courts have used the Eleventh Amendment's arm-of-the-state doctrine to decide if "entities created by state governments . . . operate as alter egos or instrumentalities of the states." Id. at 1164 (quoting Watson v. Univ. of Utah Med. Ctr., 75 F.3d 569, 574 (10th Cir. 1996)); See also Adrian, 363 F.3d at 402 (using arm-of-the-state language to hold that the University of California Regents, as manager of a university hospital, is not subject to qui tam FCA claims because the Regents are a state entity under Stevens); United States ex rel. Ali v. Danie, Mann, Johnson, & Mendenhall, 355 F.3d 1140, 1146-47 (9th Cir. 2004) (discussing use of the arm-of-the-state test for various statutes).

Because of the "virtual coincidence of scope" between the FCA and Eleventh Amendment inquiries, we conclude that the appropriate approach to determine if a state-related entity is subject to liability under the FCA is to apply Eleventh Amendment arm-of-the-state analysis. The question is thus, whether

-30-

ARUP "is 'more like a county or city than . . . like an arm of the state?'"

Sturdevant, 218 F.3d at 1164 (quoting Mount Healthy, 429 U.S. at 280).  In

conducting this inquiry, we have cautioned that "[a]lthough ultimately a matter of

federal law, arm-of-the-state status must be determined in each case by reference

to the particular state laws characterizing the entity."  Id. at 1164.

In Sturdevant, we stated that there are three factors to be considered in the

arm-of-the-state analysis:  (1) the state's legal liability for a judgment; (2) the

degree of autonomy from the state – both as a matter of law and the amount of

guidance and control exercised by the state; and (3) the extent of financing the

agency receives independent of the state treasury and its ability to provide for its

own financing.  218 F.3d at 1164.

**1**

First and foremost, it is clear that the State of Utah's treasury is not legally

liable for any judgment against ARUP.  Both the record and Utah law establish

that any judgment against ARUP would be satisfied out of ARUP's treasury, with

no recourse to either the State treasury or the general funds appropriated for the

normal operation of the University.  Utah Code Ann. § 53B-7-103(3)(d).  We

recognize that ARUP's property is vested in the State of Utah by operation of

Utah statute, Utah Code Ann. § 53B-2-101, and that any depletion of ARUP's

general treasury would require, as a practical matter, increased state funding of

the University of Utah Medical Center and the University itself.  However, we are

-31-

bound by the Supreme Court's decision in <u>Regents of California v. Doe</u>, 519 U.S. 425 (1997), which requires us "to focus on legal liability for a judgment, rather than on the practical, or indirect, impact a judgment would have on a state's treasury." <u>Sturdevant</u>, 218 F.3d at 1164 (quoting <u>Duke v. Grady Mun. Schs.</u>, 127 F.3d 972, 981 (10th Cir. 1997). Analysis of this factor clearly weighs against recognizing ARUP as an arm-of-the-state. Nevertheless, other factors remain relevant to the evaluation of an entity's status, as the absence of legal liability is not determinative. <u>Id.</u> at 1166 (citing <u>Duke v. Grady Mun. Schs.</u>, 127 F.3d at 978).

**2**

The second factor – the degree of autonomy from the state – is a bit tricky. Recognizing the difficult nature of the question, the district court relied heavily on our analysis of the factors tying the University Medical Center to the University of Utah in <u>Watson</u>, and concluded that ARUP is an arm-of-the-state. We agree that the question is a close one, but come to the opposite conclusion as to ARUP's status.

In 1984, ARUP was incorporated under the Utah Business Corporation Act, and currently exists under the Utah Revised Business Corporation Act. From 1984 to 2002, ARUP was a wholly owned subsidiary of a separate corporate entity, Associated University Pathologists, Inc., ("AUP"), which in turn was owned by the University of Utah. Although AUP was a non-stock membership

-32-

corporation, ARUP itself issued stock.[23]  Until 2002, ARUP's articles of

incorporation and by-laws were similar to those that would be adopted by an

ordinary business concern.  After AUP's 2002 dissolution, ARUP amended its

articles of incorporation to explicitly limit its operations to comport with

restrictions ARUP contends were required by the operation of Utah law from its

inception.  Tightening the focus of its argument, ARUP contends that its

commercial operations are limited to those that offer a "substantial and valuable

educational or research experience for registered students and faculty."[24]  Yet,

ARUP's actual business operations are much broader than ARUP contends, and

are not limited geographically or by the type of testing services it performs.

---

[23]  Belying ARUP's claims that it is an "integral" part of the University of Utah, the University has actively considered selling ARUP in the past, and sold ARUP's substance abuse testing division to a commercial laboratory.

[24]  We recognize that Utah's Revised Business Corporation Act authorizes a corporation engaging in a business that is subject to regulation under another Utah statute to incorporate.  The Act specifically states such incorporation is authorized, "only if permitted by, and subject to all limitations of, the other statute."  Utah Code Ann. § 16-10a-301(2).  ARUP contends that the State Board of Regents has, under its statutory authority, issued regulations that constrain ARUP's business activities to those that offer a "substantial and valuable educational or research experience for registered students and faculty," but such regulations are not pointed to by the parties and are not present in the record. There is some debate between the parties over whether we should evaluate ARUP's status at the time of the 1999 filing of the underlying complaint, or if we can consider the post-filing changes to ARUP's corporate articles of incorporation.  In 2002, ARUP changed its articles of incorporation to facilitate its request to be treated as tax-exempt by the Internal Revenue Service.  Our determination of ARUP's status is, however, not dependent on any alteration in ARUP's articles of incorporation, so we decline the parties' invitation to wade into this dispute.

-33-

ARUP engages in nationwide activity as a commercial laboratory. It is licensed in nine states and markets its services in all fifty. In addition to performing laboratory operations for the University of Utah Medical Center, ARUP also provides laboratory testing for third parties.[25] The record does not disclose the percentage of laboratory services provided to third parties that are routine versus those that provide an educational or research benefit, but it is clear from the nature of Sikkenga's claims that ARUP provides a substantial number of tests and earns the bulk of its revenue from its operations outside the University community.[26]

Under Utah Code provisions governing ordinary corporations, and those controlling the State of Utah's higher education system, ARUP may sue and be sued. Utah Code Ann. §§ 16-10a-302(1), 53B-2-101. ARUP is not incorporated as a non-profit corporation, although it has been granted tax-exempt status as a § 501(c)(3) entity by the IRS. ARUP can enter into contracts with commercial entities, and maintains bank accounts in its own name. See Utah Code Ann. § 53B-7-103(3).

Further, the relationship between the University Medical Center's

---

[25] ARUP provides both routine and esoteric laboratory testing. The more esoteric tests provide an educational or research benefit to the Department of Pathology and School of Medicine.

[26] For the fiscal year ending in June 1998, seventy-six percent of ARUP's revenues derived from testing provided to other hospitals.

Department of Pathology and ARUP is more than an inter-departmental agreement. Rather than providing services through a more informal operating scheme, the Department of Pathology has routinely entered into commercial contracts with ARUP to provide the services of approximately half of its pathologists to ARUP. At ARUP's inception, the Medical Center sold its existing hospital clinical laboratory operations and assets pursuant to a competitive contract awarded to ARUP. This purchase was funded by a combination of funds contributed by the Department of Pathology and notes payable to various departments of the University. Of ARUP's 1215 employees, barely ten percent are "pathologists," "residents and fellows," or "laboratory science students in AS, BS and MS programs that have operational responsibilities." The bulk of ARUP employees are in "laboratory operations," "general and administrative," "sales and marketing," "customer services," and "handling & logistics." Although the University's Department of Pathology provided the capital to set up ARUP, the bulk of ARUP's revenues flow from ARUP's commercial operations to the University, rather than from the University to ARUP. Retirement plans for ARUP employees, as opposed to those individuals simultaneously occupying positions within ARUP and the University of Utah, are covered under a different private retirement system than the system for University employees.

While it is clear that ARUP is a wholly owned corporation, the stock of which is owned by the University of Utah, its day-to-day operations are

independent. Although ARUP's Chairman reports to Senior Vice-President for Health Sciences,[27] who in turn reports directly to the University President, it is ARUP's Board of Directors that "sets policies and operational objectives while providing appropriate oversight of ARUP's business affairs . . . [and] monitors ARUP's business operations and financial management to help it compete within the marketplace for laboratory services." The University President provides only "strategic oversight."

We recognize that there are ties between the University and ARUP, but these arise as an incidence of ownership, and are several degrees removed from the direct relationship set up under Utah law between the University of Utah and the State. The entire University, including ARUP, is subject to the governance of the State Board of Regents, which is appointed by the Governor and approved by the State Senate. ARUP's property is vested with the State of Utah through the University and the Utah Board of Regents, and the President of the University, as representative of the owner, appoints ARUP's directors. The Chairman of the University Medical School's Department of Pathology traditionally operates as the Chairman of ARUP. Further, there are some indications that ARUP is connected with the University Medical School on an operational level. Several mandatory pathology courses in the Department of Pathology are offered within

---

[27] Who is also Dean of the University Medical School.

ARUP, and ARUP provides hands-on training for the Department of Pathology. ARUP's infusions of funds support functions within the Deparments of Pathology, Obstetrics, and Pediatrics. ARUP also provides office space to other University components at below-market rents. However, when we evaluate the entire relationship between ARUP and the University, ARUP retains substantial autonomy in its operations, and operates with little, if any guidance or interference from the University or the State.[28]

**3**

As for the third component of financial independence, the record shows a history of complex, intertwined relationships for funding capital improvement projects between the University and ARUP. ARUP's financial statements are audited by independent accountants, and subsequently included as a separate item in the financial statements of the University of Utah. This data is used at some point by the legislature in determining the overall appropriations for the

---

[28] Although present in the record and potentially relevant in other circumstances, we do not rely on several less compelling and often contradictory indicators of ARUP's status. Among these are whether ARUP has raised Eleventh Amendment immunity as a defense in other cases, whether ARUP is represented by private counsel or by the Utah Attorney General's Office, or how ARUP licenses its few vehicles. As we cautioned in Sturdevant, "it is easy to become caught up in the minutiae," but these details "must not eclipse" the distinction between instrumentalities of the state and political subdivisions of a state. 218 F.3d at 1170.

University. Utah Code Ann. § 53B-7-101. Nevertheless, it is clear that since 1989, ARUP has been self-sustaining, generating operating funds and profit through its commercial activity. It is equally clear that ARUP's substantial surplus flows to the University rather than vice-versa. When, as here, an entity is privatized and is structured to achieve financial independence from the state entity which owns it, we will not disregard its structure merely because the state retains proprietorial title to its asset. From our review of the record, we conclude that ARUP was designed to be not only self-sustaining, but a commercial "profit center" for the University Medical Center.

**4**

As recognized by the Supreme Court, "[w]hen indicators of immunity point in different directions, the Eleventh Amendment's twin reasons for being remain our prime guide." Hess v. Port Auth. Trans-Hudson, Corp., 513 U.S. 30, 47 (1994) (recognizing the protection of State treasuries and dignity as sovereigns in our federal system as the Eleventh Amendment's twin reasons for being). As in Hess, common sense and the rationale of the Eleventh Amendment do not require that sovereign immunity attach when an agency is structured to be self-sustaining and has a long history of paying its own way. Id. at 49-50.

When a state forms an ordinary corporation, with anticipated and actual financial independence, to enter the private sector and compete as a commercial entity, even though the income may be devoted to support some public function or

use, that entity is not an arm-of-the-state.  We are convinced from our review of the record that ARUP was designed to operate as a commercial enterprise, not as the alter ego of the State of Utah.  We find persuasive the reasoning in two recent cases from the Seventh and First Circuits which articulate that:

> strings that tie the [entity] to the state are found in many cases in which a state decides to privatize a formerly state function.  They do not require that privatization be treated as a farce in which the privatized entity enjoys the benefits both of not being the state and so being freed from the regulations that constrain state agencies, and of being the state and so being immune from suit in federal court.

Takle v. Univ. of Wisconsin Hospital & Clinics Auth., 402 F.3d 768, 771 (7th Cir. 2005); see also Fresenius Medical Care Cardiovascular Res., Inc. v. Puerto Rico, 322 F.3d 56 (1st Cir. 2003).

With the twin rationales for the Eleventh Amendment informing our analysis, we conclude that ARUP, with its anticipated and actual financial independence, is not an arm-of-the-state.[29]  Accordingly, we **REVERSE** the district court's dismissal of ARUP, and **REMAND** for further proceedings consistent with this opinion.[30]

### III

---

[29]  ARUP argues, as an alternative basis to affirm the district court's dismissal, that it is entitled to Eleventh Amendment immunity.  Because the analysis is essentially the same as the arm-of-the-state analysis above, it follows that ARUP is not entitled to Eleventh Amendment immunity.

[30]  We reiterate, in this respect as well, that we express no opinion of whether Sikkenga's allegations as to ARUP's allegedly false claims will survive scrutiny under Rule 9(b).

-39-

In her second FCA cause of action, Sikkenga alleged that Regence presented a false budget request to the United States in connection with an Early Claims Review that Regence was to perform in 1992. Sikkenga pleaded that the services covered by the budget request were never performed. The district court dismissed the claim as time-barred under the FCA's statute of limitations, interpreting 31 U.S.C. § 3731(b) to apply only to the United States Government, not to qui tam relators. Although acknowledging that her claim was filed more than seven years after the violation was committed, Sikkenga argues that she is entitled to a ten-year statute of limitations under § 3731(b). We review the district court's analysis of the statute de novo. UMLIC-Nine Corp. v. Lipan Springs Dev. Corp., 168 F.3d 1173, 1177 (10th Cir. 1999), using the same standard of review as discussed in section II.B.

In our analysis of this issue, we first turn to the language of the statute, which reads:

> (b) A civil action under [31 U.S.C.] section 3730 may not be brought –
>    (1) more than 6 years after the date on which the violation is committed, or
>    (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,
> whichever occurs last.

31 U.S.C. § 3731(b).

-40-

This language has been interpreted by various courts to apply to qui tam FCA actions in three different ways. In the first, courts have held that the three-year tolling provision applies only if the government has intervened in the action, because § 3731(b)(2) only applies to government officials. These courts view § 3731(b)(2) as simply inapplicable to FCA suits brought by a relator, and rely upon the statute's use of the term "official of the United States" as an indication that Congress did not intend the tolling provision of § 3731(b)(2) to apply to private qui tam relators. See United States ex rel. Amin v. George Washington Univ., 26 F. Supp. 2d 162, 172 (D.D.C. 1998); United States ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd., 6 F. Supp. 2d 263, 265 (S.D.N.Y. 1998).

Other courts have relied on the fact that procedurally qui tam relators are considered to stand in the place of the United States through the FCA. Thus, even though Congress referred only to the government in the FCA's text or legislative history, the context made it obvious that Congress intended to include qui tam relators in these provisions. These courts have held that, because of this generalized use of the term "government," the statute of limitations should be read to apply as if a relator were an official of the United States under § 3731(b)(2). See United States ex rel. Downy v. Corning, Inc., 118 F. Supp. 2d 1160, 1170 (D. Utah 2000); United States ex rel. Hyatt v. Northrop Corp., 91 F.3d 1211, 1214-16 (9th Cir. 1996). Under this interpretation, the three year statute of

limitations begins running when the relator gains knowledge of the wrongdoing, limited by the ten-year statute of repose in § 3731(b)(2).

The third interpretation, from an unpublished opinion by a district court in Utah, held that the literal text of the statute does not make § 3731(b)(2) inapplicable to relators, and interpreted § 3731(b)(2) such that a relator has until 3 years after a government official learns of a violation to file an FCA claim. United States ex rel. Colunga v. Hercules Inc., No. 89-CV-954B, 1998 U.S. Dist. LEXIS 21811, 1998 WL 310481 (D. Utah Mar. 6, 1998). Under this approach, which Sikkenga would have us declare the correct interpretation, if there is no indication that the government ever knew of the wrongdoing, the statute of limitations is ten years.

In examining the text we acknowledge that the statute is ambiguous. The text does not explicitly limit the applicability of § 3731(b)(2) to cases in which the government has intervened; however, the term "the official of the United States charged with responsibility to act in the circumstances" is also more specific than a reference to the United States or the "government" generally, and could be read to exclude qui tam relators when the United States has not intervened. When a statute's plain meaning is ambiguous, courts may seek guidance from legislative intent and statutory purpose to determine congressional intent. See In re Geneva Steel Co., 281 F.3d 1173, 1178 (10th Cir. 2002).

Several courts have examined portions of the legislative history applicable

to this provision, but their analysis is of only limited assistance in deciding the issue before us. See Hyatt, 91 F.3d at 1214 n.4, n.5 (quoting H.R. Rep. No. 99-660, at 25 (1986), and S. Rep. No. 99-345, at 30 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266, 5280, 5295); Amin, 26 F. Supp. 2d at 172-73 (discussing same).

The Senate Report accompanying the legislation, stated:

Subsection (b) of section 3731 of title 31, as amended by section 3 of the bill, would include an explicit tolling provision on the statute of limitations under the False Claims Act. The statute of limitations does not begin to run until the material facts are known by an official within the Department of Justice with the authority to act in the circumstances.

S. Rep. No. 99-345, at 30 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266, 5295.

Additionally, the Senate, when debating the 1986 amendments to the False Claims Act stated:

The committee has added a tolling provisions [sic] to the False Claims Act which is adopted directly from 28 U.S.C. § 2416(c). While section 2416(c) is a provision of general applicability, the committee intends that the False Claims Act tolling provision be liberally construed because the conduct addressed here is so inherently deceptive and carefully concealed. Thus, courts should be leary of finding that the Government had knowledge of the existence of a possible cause of action based merely upon the discovery of irregularities that fall short of a concrete suspicion that fraud has occurred. Some corroborative information to support that suspicion should be required. Similarly, care should be taken to assure that the information has reached an official in a position both to recognize the existence of a possible violation of this act and to take steps to address it.

-43-

132 Cong. Rec. S11,238 (1986) (Senator Grassley's statement explaining amendments).[31] Section 2416(c) establishes a tolling period applicable to the various limitations periods described in § 2415 when an action is brought by the United States to recover monetary damages, and also uses the term "known by an official of the United States charged with responsibility to act in the circumstances." Although these portions of the legislative history directly

_____

[31] Additionally, in testimony before the House Judiciary Committee concerning proposed changes to the False Claims Act, Mr. Richard K. Willard, Assistant Attorney General, Civil Division, Department of Justice, stated that:

> [T]he bill modifies the statute of limitations to include a discovery rule, to address the situations where the Government does not learn about the falsity of the claim at the time it was submitted. . . . [and in response to a query by Chairman Glickman asking if there was a precedent in Federal law for such a statute of limitations, replied] Actually, Mr. Chairman, there is. The general statute of limitations for the Federal Government, 28 U.S.C. § 2416(c) does include a tolling provision. The problem is the False Claims Act, as I understand it at least, has its own statute of limitations and is not subject to the general provision. So what we are proposing to do is to conform the False Claims Act to the general rule under common law in most States, and for that matter, for the Federal Government, to provide this limited tolling period where the fraudulent conduct has been concealed, as it frequently is, from the Government, and we don't find out about it until later. I can say Mr. Chairman, that I frequently see requests to sue come in right on the brink of the statute of limitations, and sometimes beyond, causing us to miss out on some claims we could otherwise bring because it has just taken that long to discover the fraud and get a case ready to pursue. This amendment would give us a little more flexibility in bringing some cases that otherwise would be barred.

False Claims Act Amendments: Hearings Before the H. Subcomm. on Admin. Law and Governmental Relations of the H. Comm. on the Judiciary, 99th Cong. 118, 159 (1986) (Statement of Mr. Richard K. Willard, Assistant Attorney General, Dep't of Justice).

support the conclusion that § 3731(b)(2) was intended by Congress to apply only to the government, and not qui tam relators, they do not conclusively resolve the issue before us.

Both the text and legislative history of the FCA use the terms "government," and "United States" to refer to suits brought by either the Attorney General or qui tam relators. See, e.g., § 3731(c) ("In any action brought under section 3730, the United States shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence."); S. Rep. No. 99-345, at 6-7 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266, 5271-72 (discussing the scienter requirement and referring to evidence that the "government" must offer). Assuredly the Senate report points to the Department of Justice official "with the authority to act in the circumstances" as the relevant official under § 3731(b), but the report's usefulness is limited by the fact that Congress chose to use a more general term in the FCA's text.[32] This is troubling in light of Congress's use of the term "Attorney General" in other sections of the FCA, such as § 3730. See § 3730 (instructing the "Attorney General" to investigate a violation under § 3729). It is unclear why Congress would explicitly refer to the "Attorney General" as the person with sole power to perform certain

_____

[32] The choice of language may arise from a desire to align the statutory language with that used in 28 U.S.C. § 2416(c), from which Congress obtained the tolling provision as described above.

functions under the FCA, and "yet leave unclear on the face of the statute whether 'the official of the United States charged with responsibility to act' is in fact only the Attorney General." United States v. Island Park, 791 F. Supp. 354, 363 (E.D.N.Y. 1992); see also United States ex rel. Hyatt v. Northrup Corp., 91 F.3d 1211, 1214-15 (9th Cir. 1996). However, when the Senate's explanation that § 3731(b) is borrowed directly from 28 U.S.C. § 2416(c) is added to the mix, the clouds clear and resolution of the matter comes into focus: Although intended to be liberally construed as to the government, the tolling provision of § 3731(b) was not intended to apply to private qui tam suits. Rather, it was intended to provide the Department of Justice with "a little more flexibility in bringing some cases that otherwise would be barred." False Claims Act Amendments: Hearings Before the H. Subcomm. on Admin. Law and Governmental Relations of the H. Comm. on the Judiciary, 99th Cong. 159 (1986) (Statement of Mr. Richard K. Willard, Assistant Attorney General, Dep't of Justice).

Statutory purposes underlying the 1986 FCA amendments support this interpretation. The purpose in amending the FCA was "not only to provide the Government's law enforcers with more effective tools, but to encourage any individual knowing of Government fraud to bring that information forward." S. Rep. No. 99-345, at 2 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266, 5266-67. Emphasizing that the statute was remedial, the Senate report reviewed the history of the FCA's qui tam provisions, quoting Justice Black:

-46-

[The FCA] is intended to protect the Treasury against the hungry and unscrupulous host that encompass it on every side, and should be construed accordingly. It was passed on the theory, based on experience as old as modern civilization, that one of the least expensive and most effective means of preventing frauds on the Treasury is to make the perpetrators of them liable to actions by private persons acting, if you please, under the strong stimulus of personal ill will or the hope of gain. Prosecutions conducted by such means compare with the ordinary methods as the enterprising privateer does to the slow-going public vessel.

Id. at 11, as reprinted in 1986 U.S.C.C.A.N. 5276 (quoting United States v. Griswold, 24 F. 361, 366 (D. Ore. 1885)). Thus, Congress viewed qui tam prosecutions as providing a means to achieve rapid exposure of fraud against the public fisc, unencumbered by the lack of resources or the bureaucracy inherent in enforcement by public authorities.

Accordingly, we hold that § 3731(b)(2) was not intended to apply to private qui tam relators at all. We recognize that this interpretation creates the possibility that a relator who learns of fraudulent activity seven years after it occurs would be barred from bringing suit.[33] However, this result is more in accord with the FCA's stated purpose of encouraging prompt action on the part of relators and would discourage those relators who chose to delay on bringing an FCA claim, or refrain from informing the government of the fraud, to allow increasing damages to accrue. Congress cannot have intended such a result.

---

[33] The United States, however, could still independently bring an FCA claim as it would be able to avail itself of the tolling provision of § 3731(b)(2).

We are also concerned that a contrary interpretation, along the lines of that adopted by the Hyatt and Downy courts, would result in evisceration of the six-year statute of limitations in § 3731(b)(1) in the vast majority of cases. It is a cardinal principle of statutory construction that our duty is to "give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section." Lamb v. Thompson, 265 F.3d 1038, 1051 (10th Cir. 2001) (quotation omitted). If relators could avail themselves of the tolling provisions of § 3731(b)(2), then we are hard pressed to describe a circumstance where the six year statute of limitations in § 3731(b)(1) would be applicable. Moreover, even if the statute was not ambiguous, the reading urged by the partial concurrence and partial dissent, and the court in Colunga, would run afoul of the absurdity doctrine. See Public Citizen v. United States Dep't of Justice, 491 U.S. 440, 455 (1989) ("Looking beyond the naked text for guidance is perfectly proper when the result it apparently decrees is difficult to fathom or where it seems inconsistent with Congress' intention."). Surely, Congress could not have intended to base a statute of limitations on the knowledge of a non-party. Consequently, we conclude that the district court did not err when it interpreted § 3731(b) to bar Sikkenga's second FCA cause of action, and its dismissal of this claim is therefore, **AFFIRMED**.

## IV

Sikkenga's third FCA cause of action alleges that Regence fraudulently

avoided CPEP score reductions by backdating a letter to a physician as part of a Comprehensive Medical Review, and by processing claims ARUP had resubmitted after Sikkenga's initial denial as adjustments rather than as reviews. Sikkenga presents two theories to support her claim. First, she argues that by engaging in these two actions, Regence "knowingly failed to perform properly under the Contract but submitted claims for administrative costs as though conforming services had been provided." Second, she contends that by avoiding CPEP score reductions Regence obtained renewals of its Medicare Part B contract, which HCFA would have otherwise terminated, and that each claim for administrative costs under the contract thereafter was therefore false.

In its analysis of this issue, the district court found that Sikkenga's third FCA cause of action failed to identify particular claims that were allegedly false under Federal Rule of Civil Procedure 9(b). The court also determined that Sikkenga's claim that the "alleged misrepresentations would have resulted in HCFA not renewing Regence's contract" was "hopelessly speculative" because there was no indication of whether or when HCFA would have decided not to renew the contract.

In reviewing a district court's dismissal pursuant to Rule 9(b) for failure to plead fraud with particularity, we accept as true all well-pleaded facts, as distinguished from conclusory allegations, and view those facts in the light most favorable to the non-moving party. See Grossman v. Novell, Inc., 120 F.3d 1112,

-49-

1118 & n.5 (10th Cir. 1997). We confine our analysis to the text of the complaint. Koch v. Koch Indus., 203 F.3d 1202, 1236 (10th Cir. 2000). Rule 9(b) states that "in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Its heightened pleading requirements apply to actions under the FCA. See supra, note 19. "At a minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where and how' of the alleged fraud." Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 903 (5th Cir. 1998), and must "set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof." Koch, 203 F.3d at 1236.

Noticeably absent from Sikkenga's original complaint are any factual allegations supporting her first theory that Regence fraudulently submitted claims for services not performed under the contract. She fails to identify any specific claim made by Regence for administrative costs under its contract. Similarly she does not identify any claims that were presented to the government to support her second theory of FCA liability – that HCFA would have terminated Regence's contract but for their fraud. She insists that her failure to comply with Rule 9(b) should be excused however, because the information is exclusively in the control of Regence, and contends that "[b]y attaching a copy of the Contract and alleging fraudulent inducement [and] how Regence would have subsequently been paid

-50-

under the contract," she has "sufficiently alleged that Regence submitted false claims for administrative costs to the government." We disagree.

Liability under the FCA requires a false claim – a "defendant's presentation of a false or fraudulent claim to the government is a central element of every False Claims Act case." United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 232 (1st Cir. 2004); see also United States ex rel. Clausen v. Lab. Corp. of Am., 290 F.3d 1301, 1311 (11th Cir. 2002); Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 785 (4th Cir. 1999). "Underlying schemes and other wrongful activities that result in the submission of fraudulent claims are included in the 'circumstances constituting fraud and mistake' that must be pled with particularity under Rule 9(b)." Karvelas, 360 F.3d at 232. However, unless such pleadings are "linked to allegations, stated with particularity, of the actual false claims submitted to the government," id., they do not meet the particularity requirements of Rule 9(b). We agree with our sibling circuit, that:

> Rule 9(b)'s directive that 'the circumstances constituting fraud and mistake shall be stated with particularity' does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payment must have been submitted, were likely submitted or should have been submitted to the Government.

Clausen, 290 F.3d at 1311. We conclude that Sikkenga's complaint falls woefully short of adequately pleading that false or fraudulent claims were

submitted by Regence. As stated by the First Circuit, to satisfy Rule 9(b)'s requirements:

> [A] relator must provide details that identify particular false claims for payment that were submitted to the government. In a case such as this, details concerning the dates of the claims, the content of the forms or the bills submitted, their identification numbers, the amount of money charged to the government, the particular goods and services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices are the types of information that may help a relator to state his or her claims with particularity. These details do not constitute a checklist of mandatory requirements that must be satisfied for each allegation included in a complaint. However, like the Eleventh Circuit, we believe that "some of this information, for at least some of the claims must be pleaded in order to satisfy Rule 9(b)."

Karvelas, 360 F.3d at 232-33 (footnotes omitted) (citing Clausen, 290 F.3d at 1312 n.21). Sikkenga neither alleges the specifics of any actual claims submitted under either of her two theories, nor pleads any false certifications upon which she premises her claim under her first theory – for failing to perform in accordance with the contract, but submitting claims for payment as if Regence had.

We agree with the district court that Sikkenga's second theory – that Regence's alleged fraudulent manipulations of its CPEP scores, would, at some point, have resulted in the HCFA not renewing Regence's contract – was "hopelessly speculative in that there is no basis for the assertion that the alleged misrepresentations would have resulted in HCFA not renewing Regence's

-52-

contract." Sikkenga's allegations under her second theory are flawed in many respects. The chain of causation required to tie Regence's alleged misrepresentations to a possible contract termination is attenuated, and lacks sufficient factual allegations to be anything more than conjecture.[34]

Sikkenga's claims that Rule 9(b)'s requirements should be relaxed because the information is exclusively within the control of the Regence defendants. Although we acknowledge that courts have sometimes relaxed the requirements of Rule 9(b), we agree with the Fifth Circuit's caution that "this exception must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." Thompson, 125 F.3d at 903 (quotation omitted). Further, even in circumstances where allegations of fraud may be based on information and belief, because the facts are peculiarly within the opposing party's knowledge, Rule 9(b) continues to require the complaint to "set[] forth the factual basis for the plaintiff's belief." Koch, 203 F.3d at 1237. Sikkenga's complaint does not state that its allegations regarding her third FCA cause of action are based on information and belief, nor do they set forth any factual basis, apart from the

---

[34] To follow Sikkenga's theory, one must accept that the two acts she alleges Regence committed would have resulted in a lowering of Regence's CPEP score, and that the lowering of the score alone would have resulted in the HCFA's decision to not renew Regence's contract. She provides no detail on the temporal proximity of the misrepresentation, the possible score reductions, or a time when the HCFA was considering the renewal of Regence's contract. Nor does she tie any specific claim thereafter to this series of events. Such a generalized daisy chain of causation does not meet the requirements of Rule 9(b).

existence of the government contract, to support that any false claims were actually made. Because Rule 9(b) does not excuse the general and speculative nature of Sikkenga's allegations, we **AFFIRM** the district court's dismissal of Sikkenga's third FCA cause of action under Federal Rule of Civil Procedure 9(b).

## V

In her fourth and final FCA cause of action, Sikkenga alleges that the Regence defendants retaliated against her in violation of 31 U.S.C. § 3730(h), the FCA's Whistleblower Protection provision. Section 3730(h) states:

> Any employee who is discharged [or] demoted . . . by his or her employer because of lawful acts done by the employee . . . in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h). This claim was dismissed by the district court under Rule 12(b)(6) because Sikkenga failed to allege that the Regence defendants were on notice that she was acting in furtherance of a private qui tam or government FCA action. In United States ex rel. Ramseyer v. Century Healthcare Corp., we held that,

> [w]hen seeking legal redress for retaliatory discharge under the FCA, plaintiff has the burden of pleading facts which would demonstrate that defendants had been put on notice that plaintiff was either taking action in furtherance of a qui tam action or assisting in an FCA action brought by the government.

90 F.3d 1514, 1522 (10th Cir. 1996). This requirement is in full accord with the

congressional purpose in passing § 3730(h):

> Section [3730(h)] provides relief only if the whistleblower can show by a preponderance of the evidence that the employer's retaliatory actions resulted 'because' of the whistleblower's participation in a protected activity. Under other Federal whistleblower statutes, the 'because' standard has developed into a two-pronged approach. One, the whistleblower must show the employer had knowledge the employee was engaged in "protected activity" and, two, the retaliation was motivated, at least in part, by the employee's engaging in protected activity.

S. Rep. No. 99-345, at 35 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266, 5300.

In Ramseyer, we held that where employees' regular duties include investigation of fraud, such persons must clearly plead notice to their employers of their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations. 90 F.3d at 1523 n.7. In this case, as in Ramseyer, Sikkenga's duties included monitoring compliance with Medicare requirements. Sikkenga communicated to her superiors within the company and to Regence's internal fraud and abuse division, her belief that violations of these requirements were occurring. On the complaint, the district court determined that Sikkenga "only took actions that she claims she was authorized to take as part of her employment with Regence," and that she failed to allege either that she informed her superiors of her intention to bring an FCA action or that she was going to report Regence's noncompliance to government officials. The district court also found that Sikkenga had not alleged that she had indicated to Regence that she was

-55-

contemplating a private qui tam action or was assisting in an FCA action brought by the government.

On our review of Sikkenga's complaint, we agree that it fails to allege that the Regence defendants had been put on notice that she was acting in furtherance of a private qui tam or government FCA action. Such an allegation is necessary to establish that Sikkenga's termination was "because" of her protected activity. Because she starkly fails to allege this causal link, we **AFFIRM** the district court's dismissal of her FCA whistleblower retaliation claim.

## VI

Ruling that Sikkenga had failed to allege a clear and substantial public policy offended by Regence's termination of her employment in violation of Utah law, the district court dismissed her state law claim as well. Sikkenga argues that this decision was in error.[35] In order to prove a tort of wrongful discharge under Utah law, a plaintiff must prove that "(1) her employment was terminated, (2) a clear and substantial public policy existed, (3) the plaintiff's conduct implicated that clear and substantial public policy, and (4) the termination and conduct in

---

[35] The district court exercised supplemental jurisdiction over Sikkenga's state law causes of action under 28 U.S.C. § 1367, finding that her state law claims against Regence for wrongful termination were factually related enough to the FCA claim against ARUP that the principles of judicial economy, fairness, and convenience would be served by allowing Sikkenga's state law claims to remain in the same action. The exercise of this discretion has not been appealed, nor has the district court's disposition of Sikkenga's remaining state law causes of action.

furtherance of the public policy are casually connected." Rackley v. Fairview Care Ctrs., Inc., 23 P.3d 1022, 1026 (Utah 2001).

This claim was dismissed by the district court because Sikkenga failed to allege a clear and substantial public policy as a prima facie element of her claim for wrongful termination. Under Utah law, "[t]he public policy exception to the employment at will presumption is much narrower than traditional notions of public policy," and is to be narrowly construed. Id. at 1026-27. A "clear" public policy must be plainly defined by one of three sources: (1) legislative enactments, (2) constitutional standards, or (3) judicial decisions, and is "substantial" only if it is of "overreaching importance to the public, as opposed to the parties only." Id. at 1027. Whether a clear and substantial public policy exists to support an employee's wrongful termination claim is a question of law. Id. at 1026.

The district court determined that, "[w]ithout a valid False Claims Act claim against Regence, . . . Sikkenga has not demonstrated a clear and substantial public policy for her wrongful termination claim against Regence." As discussed in II.B and II.C supra, the district court erred when it dismissed Sikkenga's claims under Rule 12(b)(6) because her complaint adequately alleged that Regence caused ARUP to present false or fraudulent claims to the United States

in violation of the FCA – actions for which Regence is not immune.[36]   Because

the district court's determination that Sikkenga had failed to allege a wrongful

termination in violation of public policy was premised on its conclusion that

Regence was immune under 42 U.S.C. § 1395u(e), its dependent determination

that Sikkenga has failed to allege a clear and substantial public policy necessarily

fails as well.[37]   Thus, we **REVERSE** the district court's dismissal of Sikkenga's

state law wrongful termination claim to the extent that the clear and substantial

[36]   We emphasize again that we take no position on whether Sikkenga's allegations, that Regence "caused" the false claims to be presented as discussed in II.C supra, meet the requirements of adequately alleging a violation of the FCA under Rule 9(b).  Because Sikkenga's state law claim is dependent on a "valid FCA claim" against Regence, such a determination will also be relevant to resolution of the state law claim on remand.  We also note that Sikkenga did not appeal the district court's dismissal of her claim against defendant Mitchell individually, based on its determination that Utah law did not provide for liability against a supervisor for wrongful termination.  Our ruling does not disturb that determination as the law of the case.

[37]   Sikkenga also argues that her wrongful termination allegation identified the public policy of encouraging employees to resist pressure to engage in, facilitate, or conceal illegal activity as established in Utah Supreme Court case law.  The district court, however, held that she had failed to allege any criminal conduct in her complaint, only civil wrongs, and accordingly held that this claim did not amount to pleading a clear and substantial public policy, refusing to allow her to overcome deficiencies in stating a claim by "making arguments that extend beyond the allegations in the complaint." Jojola v. Chavex, 55 F.3d 488, 494 (10th Cir. 1995) ("It is well-established, however, that in determining whether to grant a motion to dismiss, the district court, and consequently this court, are limited to assessing the legal sufficiency of the allegations contained within the four corners of the complaint.").  We agree that her complaint fails to allege a criminal violation.  On appeal, she attempts to argue that her factual pleadings amount to an allegation of participating in a crime.  Relying on Jojola, we also will not allow Sikkenga to advance arguments before us that extend beyond the allegations in her amended complaint.

public policy it alleges is a violation of the FCA, and **REMAND** for further proceedings consistent with this decision.

## VII

Accordingly, dismissal of the FCA Claim 1, the "presenting" claim against ARUP and the "causing to be presented" claim against Regence, under Rule 12(b)(6) is **REVERSED**; dismissal of Claim 2, the FCA claim involving the 1992 false budget request submitted by Regence, under Rule 12(b)(6) is **AFFIRMED**; dismissal of Claim 3, the CPEP score manipulations and contract renewal claim, under Rule 9(b) is **AFFIRMED**; dismissal of Claim 4, the FCA Whistleblower Retaliation claim against Regence, under Rule 12(b)(6) is **AFFIRMED**; and dismissal of the state law claim of wrongful termination in violation of public policy against Regence, under Rule 12(b)(6) is **REVERSED**.[38]  The case is **REMANDED** for further proceedings consistent with this opinion.

---

[38] Any further pending motions before this court are denied.

05-4088, *United States ex rel. Sikkenga v. Regence*

**HARTZ**, Circuit Judge concurring/dissenting.


I join Parts I, II(A), II(C)(1), II(C)(3), II(D), IV, and VI of Judge Lucero's

opinion. I concur in the result in Parts II(B) and II(C)(2). I dissent from Part III.

**I.     Special Concurrence Regarding Part II(B) (Regence Immunity)**

I agree that Regence is not immunized by 42 U.S.C. § 1395u(e) (1994)

from all liability arising from its payment of claims. As I shall try to explain, I

think that the most reasonable reading of § 1395u(e)(3) is that it immunizes the

carrier from liability for an employee's act when the employee is immunized from

liability for that act by paragraph (1) or (2) of § 1395u(e).

Section 1395u(e) states:

> (1) No individual designated pursuant to a contract under this section as a certifying officer shall, in the absence of gross negligence or intent to defraud the United States, be liable with respect to any payments certified by him under this section.

> (2) No disbursing officer shall, in the absence of gross negligence or intent to defraud the United States, be liable with respect to any payment by him under this section if it was based upon a voucher signed by a certifying officer designated as provided in paragraph (1) of this subsection.

> (3) No such carrier shall be liable to the United States for any payments referred to in paragraph (1) or (2).

The thrust of subsection (e) is to eliminate suits based on errors committed

without gross negligence or fraudulent intent. Paragraph (1) says that the

certifying officer is not liable for certifying a payment unless the officer acted

with gross negligence or fraudulent intent. Paragraph (2) states that the disbursing officer is not liable for making a certified payment unless the officer acted with gross negligence or fraudulent intent. Then, to avoid suits that skip the middleman and go directly against the carrier, paragraph (3) immunizes the carrier from liability when its employee is immune.

To be sure, paragraph (3)'s language poses difficulties. For one thing, it is unclear what the antecedent of *such* is in the phrase "such carrier." Much more importantly, the phrase "any payments referred to in paragraph (1) or (2)" is ambiguous. Regence would have us read the phrase as encompassing all payments, or at least all payments certified by a certifying officer. This is a possible reading. After all, paragraphs (1) and (2) describe payments certified by a certifying officer for which a certifying or disbursing officer may be liable (when the certifying or disbursing officer acts with gross negligence or intent to defraud) and payments certified by a certifying officer for which the certifying or disbursing officer is immune from liability (when there is no such gross negligence or fraudulent intent). Thus, paragraphs (1) and (2) can be said to "refer to" certified payments for which the officers are immune and certified payments for which they are not—that is, *all* certified payments. Under Regence's reading, carriers would be immune under paragraph (3) from liability for *all* payments certified by a certifying officer.

But if the intent of paragraph (3)—"No . . . carrier shall be liable . . . for

-2-

any payments referred to in paragraph (1) or (2)"—were to immunize carriers for *all* payments certified by certifying officers, one wonders why the drafters chose such a peculiar way to say it. A more natural mode of expression would have been, "no carrier shall be liable for any payments *certified by a certifying officer*." And if the "payments referred to in paragraph (1) or (2)" are both payments for which an officer may be liable and payments for which an officer is immune, why include "or (2)" at the end of the quoted phrase? Nothing would be lost by saying merely "any payment referred to in paragraph (1)," because—if one says that each paragraph "refers to" payments for which there may be liability as well as payments for which there is immunity—the same payments are "referred to" in both paragraphs (1) and (2). Each paragraph, under Regence's reading, addresses *all* certified payments: For each payment, the certifying officer is either subject to liability or immune, and the same goes for the disbursing officer; paragraph (1) addresses the certified payments for which certifying officers are immune or may be liable (that is, all certified payments), and paragraph (2) addresses certified payments for which disbursing officers are immune or may be liable (that is, all certified payments). Thus, in the phrase "payments referred to in paragraph (1) or (2)," the words "or (2)" are surplusage. Ordinarily, we should avoid a construction of a statute that renders portions of the statutory language superfluous. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 126 S. Ct. 2455, 2460 n.1 (2006) (but noting that "instances of surplusage are not

unknown").

I would interpret paragraph (3) differently. First, one must read § 1395u(e) in context. That context is liability for erroneous payments. It makes no sense to provide immunity unless the immunized conduct may otherwise generate liability. Correct payments do not generate liability. The risk of liability arises only when a certifying or disbursing officer, through fault (negligence or otherwise), does something leading to an erroneous payment. Accordingly, when paragraph (1) says that a certifying officer shall not be liable "with respect to any payments certified by him under this section," it is implicitly referring only to payments for which the officer would otherwise be liable—that is, payments based on certifications that were erroneous because of the officer's fault. Immunity would be unnecessary with respect to any other payments.

The purpose of paragraph (1), then, is to carve out from the set of payments for which the certifying officer may be liable those payments for which the officer is immune. Those payments are payments that were erroneously made because of the certifying officer's fault, but when the fault did not rise to gross negligence or intentional fraud. Given that purpose, it is natural to say that the payments "referred to in paragraph (1)" are the carved-out payments, those for which the certifying officer might have been liable (because of fault) but for the immunity provided when the officer did not act with gross negligence or fraudulent intent.

-4-

Similarly, the payments "referred to in paragraph . . . (2)" are the certified payments for which the disbursing officer might have been liable but for his statutory immunity. And paragraph (3)'s protection of carriers from liability for "any payments referred to in paragraph (1) or (2)" therefore provides essentially respondeat-superior immunity. If the carrier would otherwise be liable for an erroneous certified payment because of the fault of a certifying or disbursing officer, the carrier is immune when the officer did not act with gross negligence or intent to defraud.

Accordingly, I join the majority in rejecting Regence's defense that it is immune under § 1395u(e) from Sikkenga's claim.

## II. Special Concurrence Regarding Part II(C)(2) - Causation

I also agree with the majority that Sikkenga's complaint states a claim that Regence caused ARUP to submit a false claim. In my view, however, we should be wary of applying tort concepts of causation to the False Claims Act because of its long-term congruence with a criminal statute and its present punitive provisions.

I begin with some history of the False Claims Act. The original 1863 Act was a criminal statute which included a provision for civil claims. Section 1 imposed a criminal penalty on military personnel who "present[ed] or cause[d] to be presented for payment or approval . . . any claim upon or against the Government of the United States . . . knowing such claim to be false, fictitious, or

-5-

fraudulent." (I fail to see a material difference from the present language of 31 U.S.C. § 3729(a): "knowingly presents, or causes to be presented . . . a false or fraudulent claim for payment or approval.") Section 3 of the 1863 statute applied to nonmilitary personnel, imposing civil liability (double damages and a $2,000 penalty) on those "who shall do or commit any of the acts prohibited by any of the foregoing provisions," as well as criminal punishment if convicted. In 1874 the criminal provisions of former sections 1 and 3 were consolidated in Revised Statutes of the United States, Title 70 (Crimes) § 5438, while the civil provisions were moved to Title 36 (Debts Due by or to the United States). But the civil provisions still cross-referenced the criminal statute for a description of the prohibited conduct. *See* Rev. Statutes, Title 36 § 3490 ("any [nonmilitary] person . . . who shall do or commit any of the acts prohibited by any of the provisions of [§ 5438] shall forfeit [$2,000 plus double damages]"). Although § 5438 was repealed in 1909 and replaced by two separate criminal statutes, the repealed statute "ha[d] continued vitality . . . insofar as it specifie[d] the acts giving rise to civil liability under § 3490." *United States v. Bornstein*, 423 U.S. 303, 305 n.1 (1976). Only in 1982 did Congress enact legislation that made the False Claims Act's civil provisions freestanding, without a cross-reference to a criminal statute. *See* Pub. L. No. 97-258, § 3729, 96 Stat. 877, 978 (1982).

Courts strictly construe ambiguous language in criminal statutes in favor of lenity. *See United States v. Kozminski*, 487 U.S. 931, 952 (1988). This rule of

-6-

strict construction applies even when the language is applied in a civil context. *See Crandon v. United States*, 494 U.S. 152, 158 (1990) ("[B]ecause the governing standard is set forth in a criminal statute, it is appropriate to apply the rule of lenity in resolving any ambiguity in the ambit of the statute's coverage."). Thus, at least through 1982 the civil provisions of the False Claims Act were to be construed strictly. Indeed, *United States v. McNinch*, 356 U.S. 595 (1958), in holding that an application for credit insurance was not a "claim" within the meaning of the False Claims Act, stated: "[I]t must be kept in mind . . . [that] we are actually construing the provisions of a criminal statute. Such provisions must be carefully restricted, not only to their literal terms but to the evident purpose of Congress in using those terms, particularly where they are broad and susceptible to numerous definitions," *id*. at 598 (internal footnote omitted). To be sure, the civil and criminal provisions have since then been technically divorced; but the pertinent language of the civil provision has not materially changed, so there is no reason to believe that the language should be interpreted any differently now than it should have been in 1909 (or 1982). *See Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 132 (2003) (refusing to infer that 1986 amendments to False Claims Act silently redefined the word *person* in the statute).

Reinforcing this view is that the False Claims Act is a punitive statute, and civil punitive statutes, like criminal statutes, are to be construed strictly. *See Comm'r v. Acker*, 361 U.S. 87, 91 (1959). The Act is punitive in two respects.

-7-

The availability of treble damages, even though it has "a compensatory side," *Cook County*, 538 U.S. at 130, also has a punitive character, *see Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 785 (2000). In addition, § 3729(a)(7) of the Act provides for a penalty of $5,000 to $10,000 regardless of actual damages. *See Wood, Walker & Co. v. Evans*, 461 F.2d 852, 855 (10th Cir. 1972) (courts strictly construe statutes under which "the amount of the damages is fixed in a somewhat liquidated measure without regard to injury suffered").

Accordingly, I would refrain from "borrow[ing] traditional principles of tort law to analyze causation for damages under the FCA." Op. at 23. At this stage of the case, however, it is unnecessary to explore the precise scope of causation under the False Claims Act. We are reviewing a dismissal for failure to state a claim. The allegations of the Complaint are therefore taken as true. Sikkenga alleges that any claim submitted to Regence with diagnosis code 796.4 is a false claim. I confess to some skepticism about the allegation. I would think that a claim submitted with an improper code is simply an improperly documented claim; the underlying claim may still be proper, and compensable once the documentation is corrected. But Regence has not challenged the allegation, perhaps because it is a matter to be decided after the presentation of evidence, not when ruling on the pleadings. As for causation, Sikkenga's complaint explicitly alleges that Regence "caused ARUP to present false claims for payment or

approval." Aplt. App. at 489 (Am. Compl. at ¶ 140).  Moreover, Sikkenga describes the manner of causation.  She alleges that Regence told ARUP that it would accept claims submitted with a 796.4 code.  Given the ongoing relationship between Regence and ARUP, for Regence to inform ARUP that it would process claims that are false on their face could, in my view, constitute causing, in the criminal-law sense, ARUP to submit false claims.  The typical context in which "causing" an act to occur arises in criminal cases is when the act is performed by an innocent party rather than by a partner in crime.  For example, in a mail-fraud case the defendant "causes" a mailing to take place by handing the envelope to a friend or secretary to take to the post office, or by depositing an out-of-state check in a bank (which, at least in the old days, would need to mail the check to the originating bank for clearance).  *See*, *e.g.*, *Pereira v. United States*, 347 U.S. 1, 8-9 (1954).  What the defendant does is to set in motion a process that in the ordinary course will result in the prohibited action, without the need for any intermediary to have a nefarious motive.  Sikkenga's complaint appears to encompass an allegation that Regence in this sense caused the filing of false claims by ARUP—perhaps ARUP had a nefarious motive, but false claims would have been submitted regardless of that motive.

I should add, however, that I doubt that causation could be shown by evidence that Regence said only that it would accept claims (that may or may not be legitimate) without adequate documentation substantiating that they are proper.

In that circumstance, the submitter of the claims is not being advised to submit false claims, only that it is being trusted not to do so.

**III.   Dissent Regarding Part III (Statute of Limitations)**

Finally, I disagree with the majority's construction of the False Claims Act statute of limitations, 31 U.S.C. § 3731(b).  The statute reads:

(b)  A civil action under section 3730 may not be brought—

(1) more than 6 years after the date on which the violation of section 3729 is committed, or

(2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed.

whichever occurs last.

I join the majority in rejecting the Ninth Circuit's view in *United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211 (9th Cir. 1996), that a relator can be "the official of the United States charged with responsibility to act" in paragraph (2).  But I cannot agree that the statute can be read to say that paragraph (2) does not apply to suits by relators.  Our view of what Congress must have intended cannot substitute for statutory language.  *See Robbins v. Chronister*, 435 F.3d 1238, 1241 (10th Cir. 2006) (en banc) (strictly limiting use of absurdity doctrine to construe statute contrary to its language).  Congress may have wanted to limit relators to the six-year limitation period; but it did not say

so. I agree with District Judge Benson that there is no ambiguity to resolve. *See United States ex rel. Colunga v. Hercules, Inc.*, No. 89-CV-954B, 1998 WL 310481, \*5 (D. Utah Mar. 6, 1998). The majority's invocation of the absurdity doctrine makes no attempt to establish the satisfaction of the extremely strict conditions for application of that doctrine set forth in our recent unanimous en banc opinion on the subject. *See Robbins*. In any event, as Judge Benson explained, the plain meaning of § 3731(b) is not absurd. Congress could well have decided that a relator should not be time-barred if the government is not. To bar the relator but not the government may accomplish nothing more than preventing the relator from securing her just reward in bringing the matter to court. I would not foreclose, however, the possibility that an equitable doctrine implicitly incorporated in the statute could bar a relator who delays, for improper reasons, reporting fraud to the Government. *Cf. Young v. United States*, 535 U.S. 43, 49 (2002) (noting that equitable tolling is a background principle generally applied in construing statutes of limitations).